**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL GRAY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHA AND OMEGA SEMICONDUCTOR LIMITED, MIKE F. CHANG, YIFAN LIANG, and STEPHEN C. CHANG,<br><br>Defendants. | Case No. 1:20-cv-02414-RA<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 4

III. PARTIES ........ 5

IV. SUBSTANTIVE ALLEGATIONS ........ 7

A. Alpha And Omega's Business ........ 7

B. The Addition Of Huawei And Its Affiliates To The Entity List ........ 8

C. Following The D.O.C.'s Adoption Of Export Restrictions Against Huawei, Alpha And Omega Continued To Make Sales To Huawei ........ 14

D. Alpha And Omega Discloses Its Export Control Violations, Criminal Investigation By The DOJ, And Material Adverse Impact On Expected Results For Q3 2020 Due To Cessation Of Shipments To Huawei ........ 16

E. Additional Post-Class Period Disclosures ........ 19

V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS.. 20

VI. ADDITIONAL SCIENTER ALLEGATIONS ........ 28

A. Huawei's Addition To The Entity List Was Widely Publicized ........ 29

B. Defendants Are High-Ranking, Management-Level Executives With Extensive Experience In The Semiconductor Industry ........ 30

C. Alpha And Omega Acted With Corporate Scienter ........ 33

VII. LOSS CAUSATION ........ 34

VIII. CLASS ACTION ALLEGATIONS ........ 35

IX. UNDISCLOSED ADVERSE FACTS ........ 37

X. APPLICABILITY OF PRESUMPTION OF RELIANCE ........ 38

XI. NO SAFE HARBOR ........ 40

XII. COUNTS ........ 41

XIII. PRAYER FOR RELIEF ........ 45

XIV. JURY TRIAL DEMANDED ........ 45

Lead Plaintiff Darryl Gray ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Alpha and Omega Semiconductor Limited ("Alpha and Omega" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Alpha and Omega; and (c) review of other publicly available information concerning Alpha and Omega.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Alpha and Omega securities between August 7, 2019 and February 5, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Alpha and Omega designs, develops, and supplies power semiconductors. It purports to have a portfolio of over 2,100 products that target high volume applications, including personal computers, LED lighting, battery packs, home appliances, and consumer and industrial motor controls. Alpha and Omega is a global company, with a manufacturing facility in Hillsboro, Oregon, and offices and customers located throughout the world. Many of the Company's customers are located in the Asia Pacific region and most of the Company's revenue is generated by products it ships to this area.

3. Prior to and during the Class Period, one of Alpha and Omega's major customers was Huawei Technologies Co., Ltd. ("Huawei"). Huawei is a China-based company that is the

world's largest telecommunications equipment producer, the world's leading smartphone mobile brand, and a leader in 5G technology. Escalating trade tensions between the U.S. and China in recent years have often involved Huawei. Huawei was first accused of espionage by the U.S. in 2012.

4. After years of escalating tensions, the U.S. made its most significant moves targeting China and Huawei in May 2019. On May 15, 2019, President Donald Trump issued an executive order banning all U.S. companies from using information and communications technology from any party considered a national security threat and declared a national emergency related to this issue. That same day, the U.S. Department of Commerce ("D.O.C.") announced that Huawei and 68 of its affiliates would be added to the Entity List—meaning that U.S. companies were barred from exporting products to Huawei, and also that foreign companies were barred from exporting products with U.S. technology and parts to Huawei, unless those companies were able to obtain a special license issued by the D.O.C.

5. Reactions to the news were swift and significant as tech companies rushed to comply with the White House's directive. Major U.S. tech companies such as Google and Apple soon suspended shipments to Huawei. German semiconductor giant Infineon Technologies also suspended shipments to Huawei. The U.S.'s move was widely criticized for the negative impact it would have on the global supply chain.

6. On August 19, 2019, the U.S. added 46 more Huawei affiliates to the Entity List.

7. After the U.S. added Huawei to the Entity List, the D.O.C. received an influx of applications from parties seeking to obtain the necessary licenses in order to legally export products to Huawei and its listed affiliates. It was not until November 20, 2019, however, that the D.O.C. announced it would even start to issue such licenses.

8. On February 5, 2020, after market close, Alpha and Omega issued a press release announcing its financial results for the second fiscal quarter of 2020. Therein, the Company disclosed that the U.S. Department of Justice "recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ('Huawei')." Moreover, the Company disclosed that "[i]n connection with this investigation, [the Department of Commerce] has requested the Company to suspend shipments of its products to Huawei." Alpha and Omega stated that "financial performance in the March quarter will be negatively impacted by the Huawei shipment interruption and by additional professional fees incurred in connection with the investigation."

9. On February 5, 2020, Defendants also disclosed that the suspension of shipments to Huawei would have a material estimated $4-5 million impact on the Company's revenue for the period ending March 2020, and that the Company expected to incur $1-2 million in professional and legal fees associated with the investigation within that quarter.

10. On this news, Alpha and Omega's stock price fell $1.48 per share, or 12%, to close at $10.85 per share on February 6, 2020, on unusually heavy trading volume.

11. On February 10, 2020, Defendants filed the Company's Form 10-Q, which further disclosed the materiality of the Company's sales to Huawei. Defendants disclosed that from May 2019 through December 2019, estimated revenue generated by the Company's shipments to Huawei was $11-13 million. Defendants further disclosed that the Company's shipments to Huawei comprised approximately $9 million of the Company's revenue for the fiscal year ended June 30, 2019.

12. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects. Among other things, Defendants failed to disclose to investors: (1) that the Company's export control practices were in violation of applicable laws and regulations; (2) that, as a result, the Company was vulnerable to regulatory scrutiny and liability, and; (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

18. Plaintiff Darryl Gray, as set forth in his previously-filed certification (Dkt. No. 1), incorporated by reference herein, purchased Alpha and Omega securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Alpha and Omega Semiconductor Ltd. ("Alpha and Omega" or the "Company") is incorporated under the laws of Bermuda with its principal executive offices located in Hamilton, Bermuda. Alpha and Omega's common stock trades on the NASDAQ exchange under the symbol "AOSL." The Company conducts business globally and has sales offices and customers located throughout Asia, the U.S. and elsewhere. The Company's headquarters are in Sunnyvale, California and its main research and development facility is in Silicon Valley.

20. Defendant Mike F. Chang ("Mike Chang") was the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors at all relevant times. Mike Chang, who received his bachelor's degree in electrical engineering from the National Cheng Kung University and received graduate and doctorate degrees in electrical engineering from the University of Missouri, founded Alpha and Omega in 2000. According to the Company, "Dr. Mike Chang has extensive knowledge of the power semiconductor industry and an in-depth understanding of our strategic initiatives and day-to-day operations[.]"

21. Defendant Yifan Liang ("Liang") was the Company's Chief Financial Officer ("CFO") at all relevant times. Liang has served as the Company's CFO since August 2014 and Corporate Secretary since November 2013. Liang has held various positions at the Company since joining it in August 2004 as Corporate Controller. Liang received his bachelor's degree in management information systems from the Renmin University of China, and a master's degree in

finance and accounting from the University of Alabama. Liang has a background in finance and accounting, and previously worked at PricewaterhouseCoopers LLP ("PwC"), including as an Audit Manager in PwC's San Jose office.

22. Defendant Stephen C. Chang ("Stephen Chang") is the Company's Executive Vice President of Marketing. He has served in this position since September 2019. Prior to that, he served as the Company's Senior Vice President of Marketing (starting in November 2017). Prior to that, he served in various management positions in the Company's product line and marketing divisions, including Vice President of the MOSFET Product Line and Senior Director of Product Marketing. He has over 20 years of industry experience and leads the Company's Product Line Marketing with various managerial responsibilities, including new product introduction, product lifecycle management, business development, and business strategy. He received his bachelor's degree in Electrical Engineering from the University of California, Berkeley and his M.B.A. from Santa Clara University. Stephen Chang is the son of Defendant Mike Chang.

23. Defendants Mike Chang, Liang, and Stephen Chang (collectively the "Individual Defendants" and together with Alpha and Omega, "Defendants"), because of their high-ranking, managerial positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the

positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Alpha And Omega's Business

24. Alpha and Omega designs, develops, and supplies power semiconductors to a variety of markets, including the consumer, communications and industrial markets. The Company purports to have a portfolio of over 2,100 products that target high volume applications, including personal computers, smart phones, LED lighting, battery packs, home appliances, and consumer and industrial motor controls.

25. The Company was founded in 2000 and has expanded considerably since then. In 2012, the Company acquired a wafer fabrication facility in Hillsboro, Oregon. The Company's Oregon facility manufactures wafers, which are then sent to China for assembly and testing, thereafter they are sent back to the U.S. as finished products. Acquiring the Oregon manufacturing facility has enabled the Company to significantly reduce its reliance on third-party manufacturers and accelerate its proprietary technology development and new product introduction. In March 2016, the Company entered into a joint venture contract for the purpose of constructing its own semiconductor packaging, testing, and wafer fabrication facility in Chongqing, China. In July 2019, the Company started limited production at the Chongqing, China facility.

26. The Company sells its products primarily to distributors in the Asia Pacific region, who in turn sell these products to end customers including original design manufacturers ("ODMs") and original equipment manufacturers ("OEMs"), who then incorporate the Company's products into end applications. The vast majority of the Company's revenue is generated by sales to Hong Kong and China. For example, for fiscal year ended June 30, 2019, the Company

attributed approximately 97% of its total revenues to shipments to Hong Kong and China.

27. The Company's relationships with OEM and ODM customers are a driving force of the Company's growth. The Company has repeatedly touted its prominent global OEM and ODM customers, which include Microsoft, Intel, GE, Sony, Samsung, and Huawei.

**B. The Addition Of Huawei And Its Affiliates To The Entity List**

28. Huawei is a Chinese owned company that was founded in 1987. Huawei started as a phone switch manufacturer, but over time, Huawei has become a leader in 5G technology, the largest telecommunications equipment producer in the world, as well as the world's leading smartphone mobile brand. Huawei's headquarters are located in Shenzen, China, and the company has offices and affiliates located across 102 countries. Huawei is reliant on U.S.-made parts and technology; in 2018 alone, Huawei's Chairman Guo Ping confirmed that Huawei had purchased technology worth $18.7 billion from U.S. suppliers.

29. Huawei's massive expansion, particularly in the smartphone industry, has prompted concerns from the U.S. and other nations that Huawei may use its technology to spy on customers. Trade tensions between the U.S. and China have escalated in recent years. U.S. espionage allegations against Huawei first surfaced in 2012 when a U.S. congressional panel concluded that Huawei could pose a security threat. In early 2018, a U.S. Senate Committee hearing further discouraged American companies from conducting business with Huawei due to national security concerns.

30. On May 15, 2019, President Donald Trump issued an executive order banning all U.S. companies from using information and communications technology from any party considered a national security threat and declared a national emergency related to this issue.

31. The executive order was widely viewed as targeted towards China, particularly

China's tech sector. These suspicions were confirmed when on that same day, the U.S. Department of Commerce ("D.O.C.") publicly announced that it had placed Huawei and 68 of its affiliates on a list of parties deemed a threat to national security (the "Entity List") subject to special export regulations, stating in a press release: "This action stems from information available to the Department that provides a reasonable basis to conclude that Huawei is engaged in activities that are contrary to U.S. national security or foreign policy interest." Forty-one of the 68 Huawei affiliates that were added to the Entity List are based in China and Hong Kong.

32. The D.O.C.'s May 15, 2019 press release also quoted Secretary of Commerce Wilbur Ross as follows: "This action by the Commerce Department's Bureau of Industry and Security, with the support of the President of the United States, places Huawei, a Chinese owned company that is the largest telecommunications equipment producer in the world, on the Entity List. This will prevent American technology from being used by foreign owned entities in ways that potentially undermine U.S. national security or foreign policy interests[.]"

33. The Entity List was created in 1997 and the D.O.C.'s Bureau of Industry and Security ("B.I.S.") is responsible for publishing it. The original purpose of the Entity List was to address concerns about the proliferation of weapons of mass destruction, but over the years the Entity List has expanded in scope to be used as a general tool to protect United States security interests.

34. As described on the D.O.C.'s website, "Additions to the Entity List are decided by the End-User Review Committee which is comprised of officials from the Department of Commerce, Department of Defense, State Department, and Department of Energy. Under § 744.11(b) of the Export Administration Regulations, persons or organizations for whom there is reasonable cause to believe that they are involved, were involved, or pose a significant risk of

becoming involved in activities that are contrary to the national security or foreign policy interests of the United States, and those acting on behalf of such persons, may be added to the Entity List." As such, the B.I.S. recommends that exporters screen the parties to transactions against the Entity List as a standard practice when conducting pre-transaction due diligence.

35. Being added to the Entity List does not forever bar U.S. companies from doing business with listed entities. However, U.S. companies are required to obtain a specific license issued by the B.I.S. and are subject to policies that vary based on the listed party and the products at issue before they can lawfully export goods to a listed party. A license may be denied if the sale or transfer would harm U.S. national security or foreign policy interests.

36. The D.O.C.'s addition of Huawei and affiliates to the Entity List was widely publicized—for example, the Wall Street Journal published five articles between May 15, 2019 and May 31, 2019 covering Huawei's addition to the Entity List. The Washington Post published articles on May 15, 2019 and May 16, 2019 covering Huawei's addition to the Entity List, including a May 16, 2019 article entitled, "U.S. hits Huawei with 'death penalty.'" The New York Times published articles on May 15, 2019 and May 16, 2019 entitled, "Huawei Is a Target as Trump Moves to Ban Foreign Telecom Gear" and "Trump's Latest Move Takes Straight Shot at Huawei's Business," respectively. Fortune published an article on May 21, 2019 entitled, "Trump Blacklisted Huawei After China Trade War Negotiations Stalled." The Los Angeles Times published an article on May 23, 2019 entitled, "Trump's Huawei ban—and the risk of retaliation—threatens the global tech industry." On May 23, 2019, Semiconductor Engineering published an article which discussed the impact of the ongoing trade war between the U.S. and China, including the addition of Huawei and affiliates to the Entity List, noting, "The impact has been felt across a number of sectors, including electronics, fab tools, materials and semiconductors[,]" and, "The

electronics industry, including semiconductors, depends on worldwide trade. Tariffs are forcing companies to spend additional resources to create duplicate or alternative supply chains, which increase costs, reduces profitability and doesn't add value. Most countries that are candidates to develop operations for the semiconductor chain run deficits with the U.S. According to the SIA, the U.S. maintained a semiconductor trade surplus of $2.1 billion with China."

37. On June 21, 2019, the Semiconductor Industry Association ("SIA"), which represents U.S. leadership in semiconductor manufacturing, design, and research, released a statement by its President and CEO, John Neuffer, about the addition of Huawei and affiliates to the Entity List. Specifically, the SIA stated: "SIA companies are committed to rigorous compliance with U.S. export control regulations. . . . Each company is impacted differently based on their specific products and supply chains, and each company must evaluate how best to conduct its business and remain in compliance. Over the longer term, SIA remains concerned restrictions on our ability to sell commercial products in major markets will erode the competitiveness of the U.S. Semiconductor industry. We continue to call on the U.S. government to help advance U.S. semiconductor leadership as it works to preserve U.S. national security."

38. Reactions to the new export restrictions against Huawei by key players in the tech industry, particularly the smartphone sector, were swift and drastic. The Wall Street Journal reported on May 20, 2019 that Google had cut access to some of its Android services on Huawei smartphones, U.S. companies including Qualcomm, Lumentum Holdings, and Xilinx had suspended shipments to Huawei, and German semiconductor company Infineon Technologies AG—described in Alpha and Omega's 2019 10-K as one of "[o]ur major competitors in power discretes"—had terminated delivery to Huawei of certain components that had originated in the U.S. As noted in a May 20, 2019 TechRadar article entitled, "Trump's Huawei ban a 'double-

edged sword,'" industry experts speculated that European nations could follow the U.S.'s actions, noting that Australia had previously implemented its own ban on Huawei's 5G equipment. A June 21, 2019 article published in IT Pro entitled, "US' Huawei ban impacts global supply chains," reported that UK chipmaker IQE had slashed its sales forecasts from $175 million to $140-160 million as a direct result of the U.S.'s addition of Huawei to the Entity List; the article quoted the chief executive of IQE as follows: "These are unprecedented times for the global semiconductor industry as geopolitical conditions affect interconnected global supply chains. It is now clear that the impact of Huawei's addition to the US Bureau of Industry and Security's Entity List is having far-reaching and long-lasting impacts on global supply chains."

39. Huawei's addition to the Entity List also generated widespread criticism and sparked concerns about the state of global trade. The move was considered by some to be a brazen attack on China and Huawei, feared to destroy China and U.S. relations, and was also feared to severely harm U.S. companies and the global supply chain.

40. Indeed, the ban was structured not only to prevent U.S. companies from exporting products to Huawei and affiliates, but also to prevent non-U.S. companies from selling U.S.-made parts to Huawei and its affiliates. On May 17, 2019, CNN Business published an article summarizing those concerns as follows: "New US measures that restrict exports to Huawei could cost Silicon Valley billions in lost revenue . . . . The White House ban also disrupts the global supply chain, because foreign companies can't sell products containing US parts and components to Huawei either[.] That means Huawei won't be able to buy, for example, chipsets from a Taiwanese supplier if those chipsets contain any US parts or components." On May 23, 2019, the Los Angeles Times published an article wherein Dan Ives, a tech analyst at Wedbush, was quoted as saying, "At the center, caught in the crossfire of the U.S.-China battle will be the semiconductor

[manufacturers] as well as Apple."

41. On August 19, 2019, the D.O.C. announced in a press release that 46 additional Huawei affiliates had been added to the Entity List. The press release stated: "Huawei was added to the Entity List after the Department concluded that the company is engaged in activities that are contrary to U.S. national security or foreign policy interests, including alleged violations of the International Emergency Economic Powers Act (IEEPA), conspiracy to violate IEEPA by providing prohibited financial services to Iran, and obstruction of justice in connection with the investigation of those alleged violations of U.S. sanctions, among other illicit activities." In the same press release, Secretary of Commerce Wilbur Ross was quoted as saying, "we continue to urge consumers to transition away from Huawei's products. . . . [W]e are constantly working at the Department to ensure that any exports to Huawei and its affiliates do not violate the terms of the Entity Listing or Temporary General License."

42. The U.S.'s actions renewed publicity about Huawei's role in the U.S.-China trade war. The Washington Post published an article on August 19, 2019, describing the impact of the U.S.'s move as "hurting U.S. software and semiconductor makers that sell to Huawei. It also hurt rural companies that buy Huawei equipment, because their purchase orders seeking such equipment are technically considered exports[.]" Microwave published an article entitled, "Outlook Dims for Huawei and US Suppliers" on August 19, 2019, which stated, "Any hope of a resumption of normal business with Huawei dimmed today, as the [B.I.S.] within the U.S. Commerce Department added 46 additional Huawei affiliates to the 'entity list' meaning exporting from the U.S. to any of these organizations and individuals requires an export license—with BIS warning the going-in presumption is that any license application will be denied." Additional news outlets and tech publications including Forbes, the New York Times, the Los Angeles Times, and

Tech Crunch published articles about the U.S.'s further additions of Huawei affiliates to the Entity List on August 19, 2019.

43. After Huawei's addition to the Entity List, hundreds of businesses applied to the D.O.C. for the necessary licenses to lawfully do business with Huawei. It was not until November 20, 2019, however, that the D.O.C. announced it had finally started to issue licenses allowing some companies to do business with Huawei and its banned affiliates. On November 20, 2019, the Washington Post reported that after the months-long logjam, one quarter of licensing applications had been approved, one quarter had been denied, and the D.O.C. had taken no action on the remaining half of applications. According to the Washington Post, the denial notifications involved firms that build communication network equipment, whether 5G, radio, or other components.

### C. Following The D.O.C.'s Adoption Of Export Restrictions Against Huawei, Alpha And Omega Continued To Make Sales To Huawei

44. Alpha and Omega has had a relationship with Huawei for a number of years and has long considered Huawei to be one of Alpha and Omega's strategic customers. For example, in a slideshow presentation for a Needham Growth Conference on January 12, 2016, Alpha and Omega listed Huawei in a slide touting Alpha and Omega's "Strategic Customer Relationships" with "World Class OEMs/ODMs."

45. During Alpha and Omega's fiscal year 2019 (the year ending June 30, 2019),[1] Alpha and Omega's indirect shipments to Huawei and its affiliates through distributors accounted for approximately 2% of Alpha and Omega's total revenues.[2] For this period, Alpha and Omega reported revenues of $450.9 million. Sales to Huawei during this period, therefore, amounted to

---

[1] Alpha and Omega's fiscal year starts on July 1 and ends on June 30.

[2] Alpha and Omega disclosed this information on February 10, 2020. *See infra* at ¶53.

roughly $9.0 million.

46. Following the D.O.C.'s adoption of export restrictions against Huawei in May 2019, however, Alpha and Omega's sales to Huawei not only continued in violation of those regulations, but actually expanded and comprised an increasing percentage of Alpha and Omega's overall sales. During the eight-month period between May 2019 and December 2019 (*i.e.*, during a time that it was illegal to ship products to Huawei), Alpha and Omega's indirect shipments to Huawei and its affiliates amounted to an estimated $11-$13 million.[3] This amount represented roughly 3.5%-4.2% of Alpha and Omega's revenues during this time period.[4]

47. The Class Period begins on August 7, 2019, when Alpha and Omega announced its financial results for the fourth quarter and fiscal year 2019 (the fiscal quarter and fiscal year ended June 30, 2019). This was the first time that Alpha and Omega reported financial results following the D.O.C.'s adoption of export restrictions against Huawei. In their statements relating to those results, Defendants touted Alpha and Omega's strong sales performance and expected future sales performance without disclosing that a material portion of its revenues were derived from illegal sales to Huawei. As detailed in ¶¶55-68, *infra*, throughout the Class Period, Defendants continued to issue similar positive statements and continued to withhold the truth about Alpha and Omega's illegal sales practices. In addition, Defendants issued statements that misleadingly described hypothetical risks that Alpha and Omega could face as a result of trade restrictions or other laws without disclosing the fact that Alpha and Omega had already been violating the D.O.C.'s export

---

[3] Alpha and Omega disclosed this information on February 10, 2010. *See infra* at ¶53.

[4] Alpha and Omega reported revenues of $117,860,000 for Q2 2020 (the quarter ended December 31, 2019); revenues of $117,802,000 for Q1 2020 (the quarter ended September 30, 2019); and $111,856,000 for Q4 2019 (the quarter ended June 30, 2019). For purposes of this calculation, Plaintiff estimated that Alpha and Omega's sales in May 2019 and June 2019 accounted for two-thirds of its revenues for Q4 2019. Thus, Alpha and Omega's revenues for May through December 2019 were approximately $310,232,667.

control regulations against Huawei and, therefore, that the conditions underlying these hypothetical risks had already materialized in substantial part.

48. In addition, as detailed *infra*, Defendants issued statements throughout the Class Period indicating that they were aware of economic challenges posed by the geopolitical environment, including escalating trade tensions between the United States and China, and that Alpha and Omega's financial success had been accomplished notwithstanding those limitations. Those statements were misleading because they suggested that Alpha and Omega had accomplished its financial results by operating within the legal limits of the U.S. export control regime against China and that Alpha and Omega's financial success was not dependent on illegally evading those export controls.

### D. Alpha And Omega Discloses Its Export Control Violations, Criminal Investigation By The DOJ, And Material Adverse Impact On Expected Results For Q3 2020 Due To Cessation Of Shipments To Huawei

49. On February 5, 2020, after market close, Alpha and Omega issued a press release announcing its financial results for the second fiscal quarter of 2020. Therein, the Company disclosed that the U.S. Department of Justice ("DOJ") "recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ('Huawei')." Specifically, the press release stated, in relevant part:

> The Company notes that Department of Justice recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ("Huawei"), which were added to the "Entity List" by the Department of Commerce ("DOC"). The Company is cooperating fully with federal authorities in the investigation. The Company has maintained an export control compliance program and has been committed to comply fully with all applicable laws and regulations. ***In connection with this investigation, DOC has requested the Company to suspend shipments of its products to Huawei, and the Company is currently working with DOC to resolve this issue. Accordingly, we expect the financial performance in the March quarter will be negatively impacted by the Huawei shipment interruption and by***

> ***additional professional fees incurred in connection with the investigation***.[5] We note that the DOC order applies to only our shipment to Huawei and sales to other non-Huawei customers are expected to continue, unaffected by the order. Since this is a pending and confidential matter, the Company does not intend to comment further on the status of this investigation except as required by law.
>
> * * *
>
> **Business Outlook for Fiscal Q3 Ending March 31, 2020**
>
> *The following statements are based on management's current expectations. These statements are forward-looking, and actual results may differ materially. AOS undertakes no obligation to update these statements.*
>
> Based on this development and the estimated production loss in China due to the coronavirus outbreak and extended Chinese New Year holiday, our expectations for the third quarter of fiscal year 2020 are as follows:
>
> - Revenue is expected to be between $106 million and $110 million. We estimate that the loss of production due to the coronavirus outbreak and extended Chinese New Year holiday will reduce revenue by $6 million to $7 million for the March quarter, based on the information we have as of today. ***The interruption of shipments to Huawei is expected to reduce revenue for the March quarter by approximately $4 million to $5 million.***
>
> - GAAP gross margin is expected to be approximately 17.3% plus or minus 1%. Non-GAAP gross margin is expected to be approximately 26.0% plus or minus 1%. Note that non-GAAP gross margin excludes $0.4 million of estimated share-based compensation and $8.5 million of estimated production ramp-up costs relating to the JV Company.
>
> - GAAP operating expenses is expected to be in the range of $29.0 million plus or minus $1 million. Non-GAAP operating expenses are expected to be in the range of $25.5 million plus or minus $1 million. Both GAAP and non-GAAP operating expenses include $3.0 million to $3.3 million of estimated expenses relating to the development of our digital power controller business. Non-GAAP operating expenses ***exclude $1.0 million to $2.0 million of estimated professional fee related to the government investigation*** and $2.0 million of estimated share-based compensation charge.

50. On an investor conference call held that same day, Defendant Liang stated:

> Thank you, Stephen. ***As disclosed in our press release, we are cooperating with federal authorities in their recent investigations of our export control practices with Huawei and its affiliates. We have maintained an export control compliance***

[5] Unless otherwise noted, all emphasis in this Complaint is added.

> ***program and have been committed to fully complying with all applicable laws and regulations. In connection with this investigation, we have suspended shipment of our products to Huawei, based on the order issued by Department of Commerce***.
>
> ***This suspension is expected to reduce our revenue for the March quarter by approximately $4 million to $5 million.*** We are working with DOC to resolve this issue. Although currently, we do not know when we will be able to resume shipment to Huawei, if at all.
>
> ***In addition, we expect to incur $1 million to $2 million of professional fees during the March quarter, in connection with the ongoing government investigation***.
>
> Please note that the DOC order applies to only our shipments to Huawei. Our sales to other customers are expected to continue and grow beyond the March quarter, unaffected by the order. Since this is a pending and confidential matter, we will not be making additional comments beyond the facts that we have shared with you on this call in our press release and the related financial impact that we can assess at this time, except as required by law. Future inquiries will be directed to these statements.
>
> ***Based on this development and estimated production loss in China due to the coronavirus outbreak and extended Chinese New Year holiday, our expectations for the third quarter of fiscal year 2020 are as follows: We expect the revenue to be between $106 million and $110 million***. In addition to the impact of suspended shipment to Huawei, this guidance also reflects an estimate of $6 million to $7 million reduction in revenue due to the production loss resulted from the coronavirus outbreak and extended Chinese New Year holiday, based on the information we have as of today. We expect GAAP gross margin to be 17.3%, plus or minus 1%. We anticipate non-GAAP gross margin to be 26%, plus or minus 1%.

51. Defendants' statements tacitly acknowledged that Alpha and Omega had been violating the D.O.C.'s export restrictions against Huawei, because Alpha and Omega only suspended its shipments to Huawei at the D.O.C.'s "request[]" "[i]n connection with this investigation," even though these shipments had been illegal since May 15, 2019. In addition, Defendants made clear that the suspension of shipments to Huawei was expected to adversely affect Alpha and Omega's financial results for Q3 2020, reducing its revenue in that quarter by $4

million to $5 million, or by roughly 3.6%-4.5%.[6]

52. On this news, Alpha and Omega's stock price fell $1.48 per share, or 12%, to close at $10.85 per share on February 6, 2020, on unusually heavy trading volume.

**E. Additional Post-Class Period Disclosures**

53. After the Class Period, Defendants disclosed additional details about the materiality of the Company's sales to Huawei. On February 10, 2020, Defendants filed the Company's Form 10-Q for the second fiscal quarter of 2020, which disclosed that the Company's estimated revenues earned from shipments to Huawei from May 2019 through December 2019 were a material $11-13 million. Specifically, Defendants stated:

> The Company ships its product indirectly to Huawei and its affiliates (collectively, "Huawei") through distributors. Typically, the Company sells its products to distributors who then sell to original design manufacturers ("ODM's") that incorporate our products into end applications that are then shipped to Huawei. While distributor point of sale reports summarize distributor sales to ODM's, the Company must make certain assumptions and estimates in order to determine the amount of revenues attributed to indirect shipment to Huawei. ***During the fiscal year ended June 30, 2019, the estimated revenues attributed to indirect shipment to Huawei were approximately 2% of total revenues. During the period from May 2019 to December 2019, estimated revenues earned by the Company from shipments indirectly made to Huawei were in the range of $11 million to $13 million.***

54. The February 10, 2020 Form 10-Q provided further detail regarding the DOJ's investigation, stating that the investigation stemmed from the Company's compliance with export regulations relating to Huawei and its affiliates that had been added to the Entity List in May 2019. Specifically, Defendants stated:

---

[6] Defendants guided that Alpha and Omega's Q3 2020 revenue would be $106-$110 million, and that this amount was $4-$5 million lower than it otherwise would have been if Alpha and Omega had not suspended shipments to Huawei. Thus, guidance would have been between $110-$115 million if the shipments had not been suspended, and the $4-$5 million reduction represents roughly 3.6%-4.5% of that range.

> ***The U.S. Department of Justice recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ("Huawei"), which were added to the "Entity List" by the Department of Commerce ("DOC") in May 2019. In connection with this investigation, DOC has requested the Company to suspend shipments of its products to Huawei, and the Company complied with such request. The Company is currently working with DOC to resolve this issue in order to resume shipment to Huawei. Accordingly, we expect the financial performance will be negatively impacted by the Huawei shipment interruption until such time when DOC permits us to continue shipment to Huawei. There is no guarantee that DOC will agree to permit us to resume shipment to Huawei on a timely basis, or at all, and we may not be able to acquire new or additional customers or demand to offset such loss of shipment.*** Our failure to do so will negatively impact our revenue and profitability. Furthermore, the Company is expected to incur significant costs and expenses, including legal fees, in connection with the government investigation, which may reduce our profitability and margin.

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

55. The Class Period begins on August 7, 2019. On that day, the Company announced its fourth quarter and full year 2019 financial results in a press release. Therein, Alpha and Omega reported revenue of $450.9 million and net income of approximately $1.9 million. Moreover, the press release stated, in relevant part:

> "Our solid fourth quarter results marked a strong finish to fiscal year 2019, another record year on top of a very strong 2018. This clearly demonstrates the strength of our business strategy, operating excellence, as well as our diversified product portfolio and growing customer base," stated Dr. Mike Chang, chairman and CEO of the company.
>
> "***Looking ahead, despite the ongoing challenges of current market conditions and the geopolitical environment, we are consistently making progress toward our calendar 2021 annual revenue target of $600 million. The demand for our products, especially for mobile and home appliance applications, remains strong***. The ramp up of Chongqing Joint Venture is well timed, as we are in the process of increasing volume production for multiple global brand OEM customers. We believe the success of our new product initiatives, diversification in product portfolio and customer base, as well as disciplined and timely investment in capacity expansion over the past several years will further propel our long-term growth."

**Business Outlook for Fiscal Q1 Ending September 30, 2019**

*The following statements are based on management's current expectations. These statements are forward-looking, and actual results may differ materially. AOS undertakes no obligation to update these statements.*

- Revenue is expected to be in the range of $115 million to $119 million.

- Gross margin is expected to be approximately 20.0% plus or minus 1%. Non-GAAP gross margin is expected to be approximately 27.3% plus or minus 1%. Non-GAAP gross margin excludes $0.5 million of estimated share-based compensation charge and $8.1 million of estimated production ramp-up costs relating to the Chongqing Joint Venture as the 12" fab initiates production in the September quarter.

- Operating expenses are expected to be in the range of $27.0 million plus or minus $1 million. Non-GAAP operating expenses are expected to be in the range of $24.6 million plus or minus $1 million. Both GAAP and non-GAAP operating expenses include $2.9 million to $3.1 million of estimated expenses relating to the development of our digital power controller business. Non-GAAP operating expenses exclude $2.4 million of estimated share-based compensation charge.

56. On that same day, Defendants held an investor conference call to discuss the Company's financial results. Defendant Mike Chang reassured investors of the Company's ongoing success even in the face of escalating trade tension. Specifically, Defendant Mike Chang stated:

> We finished fiscal year 2019 with healthy top and bottom line growth, another record year on top of a very strong 2018. ***This was encouraging considering the backdrop of escalating trade tension, economic uncertainty, and the CPU shortage.***
>
> Our results clearly demonstrate the strength of our business strategy, operating excellence, as well as our diversified product portfolio and expanded customer base. ***Looking ahead, despite the challenges of current market conditions and the geopolitical environment, we are making solid progress towards our calendar 2021 target of $600 million in annual revenue.***

57. The statements in ¶¶55-56 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(1) that the Company's export control practices were in violation of applicable laws and regulations;

(2) that the Company's historical financial results and projected future results depended, in material part, on illegal sales to Huawei in violation of the D.O.C.'s export control regulations;

(3) that, as a result of the foregoing, the Company was vulnerable to regulatory scrutiny and liability and related consequences arising from investigations, including but not limited to disruptions to sales, distraction to management, reputational loss, legal fees and expenses, fines, penalties, settlements, and potential criminal prosecutions; and

(4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

58. In addition, the statements in ¶¶55-56 were materially false and/or misleading because the representations that the Company's results were obtained "despite the ongoing challenges of current market conditions and the geopolitical environment," notwithstanding "the backdrop of escalating trade tension," and "despite the challenges of current market conditions and the geopolitical environment" affirmatively and misleadingly implied: (1) that the Company's financial success had been accomplished notwithstanding those limitations; (2) that the Company had accomplished its results by operating within the legal limits of the U.S. export control regime against China, and; (3) that the Company's results were not dependent on illegally evading those export controls.

59. On August 23, 2019, Alpha and Omega filed its annual report on Form 10-K for the period ended June 30, 2019 (the "2019 10-K"), affirming the previously reported financial

results. The 2019 10-K was signed by Defendant Mike Chang and Defendant Liang. Under Item 1A of the 2019 10-K, entitled "Risk Factors," the report stated that:

> Our international operations subject our company to risks not faced by companies without international operations.
>
> We have adopted a global business model under which we maintain significant operations and facilities through our subsidiaries located in the U.S., China, Taiwan and Hong Kong. Our main research and development center is located in Silicon Valley, and our manufacturing and supply chain is located in China. We also have sales offices and customers throughout Asia, the U.S. and elsewhere in the world. Our international operations may subject us to the following risks:
>
> - economic and political instability, including trade tension between the U.S. and China;
> - costs and delays associated with transportations and communications;
> - coordination of operations through multiple jurisdictions and time zones;
> - fluctuations in foreign currency exchange rates;
> - ***trade restrictions, changes in laws and regulations relating to, amongst other things, import and export tariffs, taxation, environmental regulations, land use rights and property***; and
> - the laws of, including tax laws, and the policies of the U.S. toward, countries in which we operate.

60. In addition, under Item 1A of the 2019 10-K, the report further stated:

> *Our success depends upon the ability of our OEM end customers to successfully sell products incorporating our products.*
>
> The consumer end markets, in particular the PC market, in which our products are used are highly competitive. Our OEM end customers may not successfully sell their products for a variety of reasons, including:
>
> - general global and regional economic conditions;
> - late introduction or lack of market acceptance of their products;
> - lack of competitive pricing;
> - shortage of component supplies;

- excess inventory in the sales channels into which our end customers sell their products;
- changes in the supply chain; and
- ***changes as a result of regulatory restrictions applicable to China-exported products***.

Our success depends on the ability of our OEM end customers to sell their products incorporating our products. In addition, we have expanded our business model to include more OEMs in our direct customer base. The failure of our OEM end customers to achieve or maintain commercial success for any reason could harm our business, results of operations, and financial condition and prospects.

61. The statements in ¶¶59-60 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(1) that the hypothetically-described risks articulated in the Company's Risk Factors (and/or the conditions underlying those risks) had already materialized and actualized in substantial part, because the Company's export control practices were already in violation of applicable laws and regulations;

(2) that the Company's historical financial results and projected future results depended, in material part, on illegal sales to Huawei in violation of the D.O.C.'s export control regulations;

(3) that, as a result of the foregoing, the Company was vulnerable to regulatory scrutiny and liability and related consequences arising from investigations, including but not limited to disruptions to sales, distraction to management, reputational loss, legal fees and expenses, fines, penalties, settlements, and potential criminal prosecutions; and

(4) that, as a result of the foregoing, the Company's Risk Factors were materially misleading because they warned only of the potential consequences of changes in the

applicable law concerning sales to China without disclosing that the Company's practices already violated applicable existing law and regulations.

62. On November 4, 2019, Alpha and Omega announced its financial results for the first quarter of fiscal year 2020 in a press release, reporting revenue of $117.8 million and net income of $6.5 million. Moreover, regarding the Company's outlook for the second quarter of fiscal year 2020, the press release stated:

- Revenue is expected to be between $117 million and $121 million.
- GAAP gross margin is expected to be approximately 22.3% plus or minus 1%. Non-GAAP gross margin is expected to be approximately 27.3% plus or minus 1%. Note that non-GAAP gross margin excludes $0.4 million of estimated share-based compensation and $5.8 million of estimated production ramp-up costs relating to the JV Company.
- GAAP operating expenses is expected to be in the range of $27.4 million plus or minus $1 million. Non-GAAP operating expenses are expected to be in the range of $25.4 million plus or minus $1 million. Both GAAP and non-GAAP operating expenses include $3.1 million to $3.3 million of estimated expenses relating to the development of our digital power controller business. Non-GAAP operating expenses exclude an estimated share-based compensation charge of approximately $2.0 million.
- Tax expense is expected to be approximately $0.5 million to $0.7 million.
- Loss attributable to noncontrolling interest is expected to be around $3.6 million. On a non-GAAP basis, excluding estimated production ramp-up costs relating to the JV Company, this item is expected to be approximately $0.9 million.

63. On an investor conference call held that same day, Defendants reiterated their positive outlook. Specifically, Defendant Mike Chang stated:

> Now that we are aligned with top-tier global brand OEMs and ODMs, we will continue to keenly focus on expanding our presence to multiple generation smartphone models and peripheral devices….We plan to grow our share by adding additional layers of business year-after-year at multiple global OEMs and ODMs[.]
>
> Despite macro headwinds and growing market uncertainty, we are generating positive results by executing our prudent business strategy. Our diversified products are well positioned with strategic players in multiple key market segments.

> We are committed to even better serving those customers through increasingly sophisticated and total solutions and a reliable supply chain. We are encouraged by the tremendous growth opportunities ahead of us, which give us confidence in achieving our calendar year 2021 target of $600 million of annual revenue.

64. On that same call, Defendant Stephen Chang reiterated his father's optimism, stating that even in the face of trade tensions which had negatively impacted the 5G telecom business, the Company was expected to meet its revenue expectations. Specifically, Defendant Stephen Chang stated:

> Finally, let's discuss the communications segment, which was 18.1% of revenue in the quarter, up 24.6% sequentially and up 19.2% year-over-year . . . . ***We saw some softness in the 5G telecom business during the September quarter in the midst of trade tensions. Looking to the December quarter, we expect the battery protection business to decline slightly. This will be offset by some recovery of our 5G telecom business. Therefore, we expect to maintain this segment's revenue in the December quarter.***

65. The statements in ¶¶62-64 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(1) that the Company's export control practices were in violation of applicable laws and regulations;

(2) that the Company's historical financial results and projected future results depended, in material part, on illegal sales to Huawei in violation of the D.O.C.'s export control regulations;

(3) that, as a result of the foregoing, the Company was vulnerable to regulatory scrutiny and liability and related consequences arising from investigations, including but not limited to disruptions to sales, distraction to management, reputational loss, legal fees and expenses, fines, penalties, settlements, and potential criminal prosecutions; and

(4) that, as a result of the foregoing, Defendants' positive statements about the

Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

66. In addition, the statements in ¶64 were materially false and/or misleading because the representation that the Company's results were obtained despite "softness in the 5G telecom business during the September quarter in the midst of trade tensions" affirmatively and misleadingly implied: (1) that the Company's financial success had been accomplished notwithstanding those limitations; (2) that the Company had accomplished its results by operating within the legal limits of the U.S. export control regime against China, and; (3) that the Company's results were not dependent on illegally evading those export controls.

67. On November 12, 2019, Alpha and Omega filed its quarterly report on Form 10-Q for the period ended September 30, 2019 (the "Q1 2020 10-Q"), affirming the previously reported financial results. The Q1 2020 10-Q was signed by Defendant Liang. Under Item 1A of the Q1 2020 10-Q, entitled "Risk Factors," the report stated that, except for certain risks associated with proposed tariffs, "there have been no material changes to the risk factors [the Company] previously disclosed in [its] filings with the SEC."

68. The statements in ¶67 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(1) that the hypothetically-described risks articulated in the Company's Risk Factors (and/or the conditions underlying those risks) had already materialized and actualized in substantial part, because the Company's export control practices were already in violation of applicable laws and regulations;

(2) that the Company's historical financial results and projected future results depended, in material part, on illegal sales to Huawei in violation of the D.O.C.'s export control regulations;

(3) that, as a result of the foregoing, the Company was vulnerable to regulatory scrutiny and liability and related consequences arising from investigations, including but not limited to disruptions to sales, distraction to management, reputational loss, legal fees and expenses, fines, penalties, settlements, and potential criminal prosecutions; and

(4) that, as a result of the foregoing, the Company's Risk Factors were materially misleading because they warned only of the potential consequences of changes in the applicable law concerning sales to China without disclosing that the Company's practices already violated applicable existing law and regulations.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

69. As alleged herein, Defendants acted with scienter since Defendants knew or were deliberately reckless in disregarding that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or were deliberately reckless in disregarding that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Alpha and Omega, their control over, and/or receipt and/or modification of Alpha and Omega's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Alpha and Omega, participated in the fraudulent scheme

alleged herein.

70. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

**A. Huawei's Addition To The Entity List Was Widely Publicized**

71. The U.S.'s addition of Huawei—the world's largest telecommunications company, and a leader in 5G technology—to the Entity List was widely publicized and sparked strong reactions around the world and across industries, particularly the tech industry. It was viewed by many as the U.S.'s most aggressive action yet in the escalating U.S.-China trade war.

72. The U.S.'s move raised great concerns that it would not only harm the financial state of U.S. tech companies like Google and Apple, but would harm industry companies globally, as foreign companies were also barred from selling parts and technology that had originated in the U.S. to Huawei and listed affiliates. In the wake of the news, tech companies in the U.S. and other nations, including German semiconductor giant Infineon Technologies, quickly ceased sales to Huawei and its affiliates in order to comply with export regulations.

73. Throughout the Class Period, Defendants assured investors that they were well-aware of developments in the geopolitical environment and growing trade tensions between the U.S. and China, and that they had considered all of these elements in their representations about Alpha and Omega's business, finances, and prospects. For example, on an investor conference call on August 7, 2019, Defendant Mike Chang assured investors of the Company's continued

success "despite the challenges of current market conditions and the geopolitical environment," and "escalating trade tension." Moreover, the Company's 2019 10-K provided an update on the tariffs the U.S. had imposed on Chinese goods; noting that the "continuing trade war could have significant adverse effects . . . and reduce demand for our power semiconductor products[.]" As such, Defendants represented to investors throughout the Class Period that they were knowledgeable about and appreciated the impact and risks of trade tensions between the U.S. and China on the Company's business.

74. Due to the highly publicized and controversial addition of Huawei to the Entity List, it is implausible that Defendants were unaware that Huawei and numerous affiliates had been placed on the Entity List in May 2019, thus barring their sales to Huawei, long before their disclosure of the DOJ investigation on February 5, 2020. Major tech companies and competitors of Alpha and Omega in the U.S. and abroad quickly suspended shipments to Huawei when news broke that the D.O.C. had added Huawei to the Entity List in May 2019.

75. The DOJ's investigation into Defendants' compliance with export regulations in connection with Huawei and its listed affiliates, which commenced during the Class Period, further demonstrates Defendants' scienter.

### B. Defendants Are High-Ranking, Management-Level Executives With Extensive Experience In The Semiconductor Industry

76. All of the Individual Defendants are experienced, management-level, corporate executives with specialized experience in the semiconductor industry, who received advanced degrees in both China and the U.S.

77. Defendant Mike Chang founded the Company in 2000 and was the Company's CEO and Chairman of the Board of Directors at all relevant times. He is also President of Alpha and Omega's wholly owned subsidiary, Jireh Semiconductor Inc. Prior to establishing Alpha and

Omega, Mike Chang served as Executive Vice President of Siliconix Inc., a global manufacturer and supplier of discrete and other power semiconductors, from 1998 through 2000, and held various management positions at Siliconix Inc. from 1987 through 1998. Mike Chang obtained his bachelor's degree in China and his graduate and doctorate degrees in the U.S. According to the Company, "Dr. Chang has extensive knowledge of the power semiconductor industry and an in-depth understanding of our strategic initiatives and day-to-day operations[.]"

78. Defendant Liang was the Company's CFO at all relevant times. Liang has held various positions at the Company since joining it in August 2004 as Corporate Controller. Liang received his bachelor's degree in China and his master's degree in the U.S. Liang has a professional and educational background in finance and accounting, and previously worked at PricewaterhouseCoopers LLP.

79. Defendant Stephen Chang is the Company's Executive Vice President of Marketing. He has served in this position since September 2019. Prior to that, he served as the Company's Senior Vice President of Marketing (starting in November 2017). Prior to that, he served in various management positions in the Company's product line and marketing divisions, including Vice President of the MOSFET Product Line and Senior Director of Product Marketing. He has over 20 years of industry experience and leads the Company's Product Line Marketing with various managerial responsibilities, including new product introduction, product lifecycle management, business development, and business strategy. He received his bachelor's degree in Electrical Engineering from the University of California, Berkeley and his M.B.A. from Santa Clara University. Stephen Chang is the son of Defendant Mike Chang.

80. The Individual Defendants' educational and professional experience demonstrate that they are well-versed in the business of semiconductors, especially Alpha and Omega's

business, as each has been involved with the Company for most of the Company's twenty-year history. By virtue of this experience and as high-ranking managerial employees involved in the day-to-day operations of the Company, they were undoubtedly aware of the materiality of the Company's sales to Huawei and affiliates, and of Huawei and affiliates' addition to the Entity List before Defendants disclosed the DOJ investigation at the end of the Class Period.

81. During the Class Period, Alpha and Omega had a small, core group of decision-makers. The Company's small, tight-knit group of executive officers controlled the Company, including its business practices, earnings announcements and SEC filings. According to the Company's 2019 10-K, for fiscal year ended June 30, 2019, the Company had a total of just four executive officers, which included Defendant Mike Chang and Defendant Yifan Liang. According to the Company's 10-Q filed on November 12, 2019, "The Company is organized as, and operates in, one operating segment: the design, development and supply of power semiconductor products for computing, consumer electronics, communication and industrial applications. The chief operating decision-maker is the Chief Executive Officer. The financial information presented to the Company's Chief Executive Officer is on a consolidated basis, accompanied by information about revenue by customer and geographic region, for purposes of evaluating financial performance and allocating resources. The Company has one business segment, and there are no segment managers who are held accountable for operations, operating results and plans for products or components below the consolidated unit level."

82. In addition, Defendant Mike Chang and Defendant Liang signed and submitted certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") for the Company's Class Period financial statements, attesting that they reviewed these forms and that these reports did not contain false statements of material fact or material omissions, and that they

fairly presented in all material respects the financial condition and results of operations of the Company. During the Class Period, Defendant Mike Chang and Defendant Liang both signed certifications pursuant to SOX attached as exhibits to the Company's 2019 10-K and Q1 2020 10-Q.

83. In each SOX Certification referenced in this Amended Complaint, the Individual Defendants certified that:

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements ….

84. Accordingly, Defendants confirmed their responsibility for the Company's disclosures and financial oversight as disclosed in the Company's Class Period SEC filings.

### C. Alpha And Omega Acted With Corporate Scienter

85. Each of the Individual Defendants is a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Alpha and Omega, including each high-ranking officer or director, is imputable to Alpha and Omega. The knowledge of each of these individuals should therefore be imputed to Alpha and Omega for the purposes of assessing corporate scienter.

86. Even aside from the scienter of the Individual Defendants, the facts alleged herein

raise a strong inference of corporate scienter as to Alpha and Omega as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to investors.

## VII. LOSS CAUSATION

87. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

88. During the Class Period, Plaintiff and the Class purchased Alpha and Omega's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

89. The truth regarding Alpha and Omega's financial condition and/or its export control violations was partially revealed to the market, and/or the concealed risks partially materialized, on or about February 5, 2020.

90. On February 5, 2020, after market close, Alpha and Omega issued a press release announcing its financial results for the second fiscal quarter of 2020. Therein, the Company disclosed that the U.S. Department of Justice "recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ('Huawei')." Moreover, the Company announced that "[i]n

connection with this investigation, [the Department of Commerce] has requested the Company to suspend shipments of its products to Huawei." Alpha and Omega stated that "financial performance in the March quarter will be negatively impacted by the Huawei shipment interruption and by additional professional fees incurred in connection with the investigation."

91. On February 5, 2020, Defendants also disclosed that the suspension of shipments to Huawei would have a material estimated $4-5 million impact on the Company's revenue for the period ending March 2020, and that the Company expected to incur $1-2 million in professional and legal fees associated with the investigation within that quarter.

92. On this news, Alpha and Omega's stock price fell $1.48 per share, or 12%, to close at $10.85 per share on February 6, 2020, on unusually heavy trading volume.

## VIII. CLASS ACTION ALLEGATIONS

93. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Alpha and Omega securities between August 7, 2019 and February 5, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

94. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alpha and Omega's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Alpha and Omega common

stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Alpha and Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

97. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Alpha and Omega; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

98. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. UNDISCLOSED ADVERSE FACTS

99. The market for Alpha and Omega's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Alpha and Omega's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Alpha and Omega's securities relying upon the integrity of the market price of the Company's securities and market information relating to Alpha and Omega, and have been damaged thereby.

100. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Alpha and Omega's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Alpha and Omega's business, operations, and prospects as alleged herein.

101. At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Alpha and Omega's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

102. The market for Alpha and Omega's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Alpha and Omega's securities traded at artificially inflated prices during the Class Period. On January 15, 2020, the Company's share price closed at a Class Period high of $14.25 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Alpha and Omega's securities and market information relating to Alpha and Omega, and have been damaged thereby.

103. During the Class Period, the artificial inflation of Alpha and Omega's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Alpha and Omega's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Alpha and Omega and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

104. At all relevant times, the market for Alpha and Omega's securities was an efficient market for the following reasons, among others:

(a) Alpha and Omega shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Alpha and Omega filed periodic public reports with the SEC and/or the NASDAQ;

(c) Alpha and Omega regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Alpha and Omega was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

105. As a result of the foregoing, the market for Alpha and Omega's securities promptly digested current information regarding Alpha and Omega from all publicly available sources and reflected such information in Alpha and Omega's share price. Under these circumstances, all purchasers of Alpha and Omega's securities during the Class Period suffered similar injury through their purchase of Alpha and Omega's securities at artificially inflated prices and a presumption of reliance applies.

106. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

107. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Alpha and Omega who knew that the statement was false when made.

## XII. COUNTS

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

108. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

109. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Alpha and Omega's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

110. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alpha and Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

111. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alpha and Omega's financial well-being and prospects, as specified herein.

112. Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alpha and Omega's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alpha and Omega and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

113. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

114. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Alpha and Omega's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Alpha and Omega's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Alpha and Omega's securities during the Class Period at artificially high prices and were damaged thereby.

116. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Alpha and Omega was experiencing, which was not disclosed by Defendants, Plaintiff and

other members of the Class would not have purchased or otherwise acquired their Alpha and Omega securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

117. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

118. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

119. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

120. The Individual Defendants acted as controlling persons of Alpha and Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level, management positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

121. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to

prevent the issuance of the statements or cause the statements to be corrected.

122. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123. As set forth above, Alpha and Omega and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: August 28, 2020

By: *s/ Natalie S. Pang*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Natalie S. Pang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Lead Counsel for Plaintiff and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On August 28, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 28, 2020.

*s/ Natalie S. Pang*

Natalie S. Pang