USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/27/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DARRYL GRAY, *individually and on behalf of all others similarly situated*,

                Plaintiff,

       v.

ALPHA AND OMEGA SEMICONDUCTOR LIMITED, MIKE F. CHANG, YIFAN LIANG, STEPHEN C. CHANG,

                Defendants.

---

No. 20-CV-2414 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Darryl Gray brings this putative class action against Alpha and Omega Semiconductor Limited ("AOS"), as well as the company's Chief Executive Officer and Board Chairman Mike F. Chang, its Chief Financial Officer Yifan Liang, and its Executive Vice President of Marketing Stephen C. Chang (collectively, "Defendants"[1]), alleging that, between August 7, 2019 and February 5, 2020 (the "Class Period"), Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Specifically, Plaintiff alleges that Defendants misled investors about AOS's sales to the Chinese telecommunications giant Huawei in the wake of Huawei's addition to the U.S. Department of Commerce's "Entity List" in May 2019, which brought AOS under investigation by the Department of Justice. Before the Court are Defendants' motion to dismiss the operative complaint, Dkt. 23, and Plaintiff's motion to strike certain materials

---

[1] Mike Chang, Stephen Chang, and Yifan Liang are collectively referred to as the "Individual Defendants."

attached to Defendants' motion, Dkt. 28. For the following reasons, Defendants' motion is granted. Plaintiff will, however, be given an additional opportunity to file an amended complaint that cures the deficiencies identified below, should he have a good faith basis to do so.

## BACKGROUND

### I.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint ("Am. Compl."), Dkt. 17, as well as news articles incorporated by reference in the complaint, and are assumed to be true for purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

### A.  AOS and Huawei

Defendant Alpha and Omega Semiconductor Limited, or AOS, is a global semiconductor company incorporated in Bermuda. It has a manufacturing facility in Hillsboro, Oregon; headquarters in Sunnyvale, California; a primary R&D facility in Silicon Valley; and sales offices around the world. Am. Compl. ¶¶ 2,19. Its common stock trades on the NASDAQ exchange under the symbol "AOSL." *Id*. At all relevant times, Defendant Mike Chang was its CEO and the Chairman of its Board of Directors, Defendant Yifan Liang was its Chief Financial Officer, and Defendant Stephen Chang was its Senior Vice President of Marketing or its Executive Vice President of Marketing. *Id*. ¶¶ 19-22. Darryl Gray, who was appointed lead plaintiff on July 1, 2020, owned AOS securities during the Class Period. *Id*. ¶ 81; *see also* Dkt. 8.

AOS designs and develops semiconductors that are ultimately incorporated into end applications such as computers, smart phones, LED lights, battery packs, home appliances, and consumer and industrial motor controls. *Id*. ¶ 24. AOS generates most of its revenue from shipping products to the Asia-Pacific region. *Id*. ¶ 2. AOS primarily sells products to *distributors*

in Asia, who in turn sell the products to *original design manufacturers* ("ODMs") and *original equipment manufacturers* ("OEMs"), who then incorporate AOS's products into end applications. *Id*. ¶ 26.

One such indirect customer is the Chinese firm Huawei. *Id*. ¶ 27. The Shenzhen-based company is the largest telecommunications equipment producer in the world, a leader in 5G technology, and the world's leading smartphone mobile brand. *Id*. ¶ 28. It is heavily reliant, however, on U.S.-made technology, including the electronic components that go into its smartphones and equipment and the software that powers its phones. *Id*. AOS has for a number of years considered Huawei to be one of the "World Class OEMs/ODMs" with whom it has a strategic relationship. *Id*. ¶ 44. Indirect shipments to Huawei and its affiliates through distributors accounted for an estimated two percent of AOS's total revenues during Fiscal Year 2019. *Id*. ¶ 45. *See also id*. ¶ 53 (quoting AOS's 10-Q Form for 2020 Q2) ("The Company ships its product indirectly to Huawei and its affiliates through distributors. Typically, the Company sells its products to distributors who then sell to original design manufacturers ('ODMs') that incorporate our products into end applications that are then shipped to Huawei.").

### B.  Huawei's Addition to the Entity List and AOS's Continued Shipments

Huawei's emergence as a tech giant has prompted concerns among U.S. national security officials that Huawei technology could provide the Chinese government with a means of spying on customers, or that the ubiquity of its technology could be leveraged in the event of a U.S-China conflict. *Id*. ¶ 36; *see also* Cecilia Kang and David E. Sanger, *Huawei is a Target as Trump Moves to Ban Foreign Telecom Gear*, N.Y. Times (May 15, 2019), available at https://www.nytimes.com/2019/05/15/business/huawei-ban-trump.html. Huawei was also at the center of rising trade tensions between the United States and China that were flaring in 2019,

with each country imposing hundreds of billions of dollars of tariffs on the other. *See* Am. Compl. ¶ 36; *see also* Jenny Leonard, Nick Wadhams, and Margaret Talev, *Trump Blacklisted Huawei After China Trade War Negotiations Stalled*, FORTUNE (May 21, 2019), available at https://fortune.com/2019/05/21/trump-huawei-ban-china-trade-war/.

Seemingly motivated by a combination of national security and trade concerns, on May 15, 2019, the United States added Huawei and 68 of its affiliates to the "Entity List," an export control tool maintained by the Department of Commerce's Bureau of Industry and Security. Am Compl. ¶ 31. An additional 46 affiliates were added in August 2019. *Id*. ¶¶ 41-42. The purpose of the Entity List is to make it more difficult for U.S.-made technology to wind up in the hands of businesses, organizations, and people "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16; *see also* Am. Compl. ¶ 33. The listing of Huawei was widely publicized, and viewed as a significant escalation in the U.S.-China trade war. Am. Compl. ¶¶ 71-75. Press articles referred to the listing as a "ban" on sales of U.S.-made goods to Huawei, *id*. ¶ 36, and a number of U.S. and international companies suspended shipments to Huawei following its addition to the Entity List, *id*. ¶¶ 38, 73-74.

Although the listing of Huawei has been described in the press (and in the complaint) as a "ban," as the complaint and Plaintiff's opposition recognize, when an entity is added to the list, American companies are not forever barred from doing business with it. *Id*. ¶ 35. Rather, exporting certain goods—namely, items that are subject to the Export Administration Regulations ("EAR")—to listed entities generally requires a license from the Commerce Department. *Id*. The EAR also contains multiple exemptions that, under some circumstances,

allow sales to companies on the Entity List even without a license. As Plaintiff acknowledges in

opposition to the motion,

> Companies seeking to lawfully export goods to an Entity List party are required to obtain a specific license issued by the BIS, *unless a particular exemption applies*. Accordingly, those seeking to do business with a listed party are expected, as standard practice, to thoroughly analyze export regulations to assess whether and to what extent they may lawfully continue to sell products to a listed party, and the BIS instructs companies seeking to export goods they believe are subject to an exemption to "perform careful due diligence to ensure the item is not going to an embargoed or sanctioned country, a prohibited end-user, or used in a prohibited end-use."

*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.

Mem."), Dkt. 26, at 8 (citing Am. Compl. ¶¶ 34-35) (emphasis added). As the Amended

Complaint notes, the Semiconductor Industry Association released a statement in June 2019

regarding the addition of Huawei to the entity list, stating that:

> SIA companies are committed to rigorous compliance with U.S. export control regulations. **As we have discussed with the U.S. government, it is now clear some items may be supplied to Huawei consistent with the Entity List and applicable regulations**. Each company is impacted differently based on their specific products and supply chains, and each company must evaluate how best to conduct its business and remain in compliance.

Am. Compl. ¶ 37; Semiconductor Industry Association, *SIA Statement on the Scope of the*

*Addition of Huawei to the Commerce Department's Entity List*, SEMICONDUCTORS.ORG (June 21,

2019), available at https://www.semiconductors.org/sia-statement-on-the-scope-of-the-addition-

of-huawei-to-the-commerce-departments-entity-list/.[2] Accordingly, the fact that a U.S. company

---

[2] Although the Complaint itself omitted parts of the SIA statement, including the bolded text above, the Court is entitled to consider the full statement. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569, n. 13 (2007) ("[T]he District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 764 (S.D.N.Y. 2019) (finding that news articles that the complaint explicitly identified and quoted from were incorporated by reference).

is exporting goods to an entity on the Entity List does not under all circumstances mean that the company is doing so in violation of export controls. *Id*.

Following the listing of Huawei, AOS continued to sell products to the company, albeit through its usual indirect channels. *Id*. ¶ 46. In fact, AOS's shipments to Huawei increased following the listing of Huawei, totaling an estimated 3.5 to 4.2 percent of AOS's revenues from May 2019 to December 2019 (compared to an estimated two percent of revenues across all of FY2019). *Id*. Plaintiff alleges that all such business was necessarily "illegal." *See, e.g., id*. ¶¶ 46, 47, 48, 51, 57, 58, 61, 66, 68. As discussed below, the assertion that continued sales to Huawei were necessarily in violation of law is conclusory. Although the complaint acknowledges that a company's "[b]eing added to the Entity List does not forever bar U.S. companies from doing business," *id*. ¶ 35, and that each semiconductor company is impacted differently by the addition of Huawei to the list, *id*. ¶ 37, it presumes that all of AOS's indirect sales were necessarily in violation of the export controls.

### C.  Announcement of DOJ Investigation and Stock Drop

On February 5, 2020, AOS issued a press release regarding its financial results for the second quarter of 2020. The statement disclosed that the U.S. Department of Justice had "recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ('Huawei')." Am. Compl. ¶ 49. As part of that investigation, the Department of Commerce requested that AOS "suspend shipments of its products to Huawei." *Id*. The release asserted that AOS "has maintained an export control compliance program and has been committed to comply fully with all applicable laws and regulations," and was "working with DOC to resolve this issue." *Id*. The company predicted that the interruption of shipments to Huawei would reduce revenue for the

March quarter by $4 million to $5 million, and that the DOJ investigation would cost AOS an estimated $1 million to $2 million in professional fees. *Id*. The same press release also mentioned an "estimated production loss in China due to the coronavirus outbreak and extended Chinese New Year holiday," and estimated that this development would separately reduce revenue by $6 million to $7 million for the March quarter. *Id*. Following these disclosures, AOS's stock price fell $1.48 per share, or 12 percent, closing at $10.85 per share on February 6, 2020. *Id*. ¶ 52.

On February 10, 2020, AOS issued its 10-Q form for the second quarter of 2020, which reiterated the following information concerning the DOJ investigation:

> The U.S. Department of Justice recently commenced an investigation into the Company's compliance with export control regulations relating to certain business transactions with Huawei and its affiliates ("Huawei"), which were added to the "Entity List" by the Department of Commerce ("DOC") in May 2019. In connection with this investigation, DOC has requested the Company to suspend shipments of its products to Huawei, and the Company complied with such request. The Company is currently working with DOC to resolve this issue in order to resume shipment to Huawei. Accordingly, we expect the financial performance will be negatively impacted by the Huawei shipment interruption until such time when DOC permits us to continue shipment to Huawei. There is no guarantee that DOC will agree to permit us to resume shipment to Huawei on a timely basis, or at all, and we may not be able to acquire new or additional customers or demand to offset such loss of shipment. Our failure to do so will negatively impact our revenue and profitability. Furthermore, the Company is expected to incur significant costs and expenses, including legal fees, in connection with the government investigation, which may reduce our profitability and margin.

*Id*. ¶ 54. Beyond the information disclosed by AOS in its February 2020 statements, there is no indication in the record before the Court as to whether the investigation has concluded or whether any findings have been made. *See* Pl. Mem. at 14.

### D. Alleged Material Misstatements and Omissions During the Class Period

The complaint alleges that AOS made a number of false and misleading statements and omissions during the period that began on August 7, 2019, when AOS announced its financial

results for the fourth quarter of 2019 and FY2019, and ended on February 5, 2020, when AOS disclosed the existence of the DOJ investigation. In general, Plaintiff asserts that AOS duped investors by (1) making positive statements about its present and future sales "without disclosing that a material portion of its revenues were derived from illegal sales to Huawei;" (2) issued statements describing "hypothetical risks" that could materialize as a result of trade restrictions being imposed amidst U.S.-China trade tensions, without disclosing that AOS "had already been violating the [Department of Commerce's] export control regulations against Huawei, and therefore, that the conditions underlying these hypothetical risks had already materialized in substantial part"; and (3) misleadingly implied, in describing the difficult "geopolitical environment" and U.S.-China tensions, that AOS had achieved its continued success by finding ways to contend with the regulatory consequences of that environment, rather than by flouting export controls. Am. Compl. ¶¶ 47-48. Plaintiff asserts that the following statements were false or misleading:

First, in an August 7, 2019 press release, AOS announced its fourth quarter and full 2019 financial results, reporting revenue of $450.9 million and touting "the success of our new product initiatives, diversification in product portfolio and consumer base, as well as disciplined and timely investment in capacity expansion." *Id*. ¶¶ 55. The statement read: "Looking ahead, despite the ongoing challenges of current market conditions and the geopolitical environment, we are consistently making progress toward our calendar 2021 annual revenue target of $600 million." *Id*. The same day, Defendants held an investor conference call, in which Mike Chang lauded the company's performance as "encouraging considering the backdrop of escalating trade tension, economic uncertainty, and the CPU shortage." *Id*. ¶ 56. Plaintiff asserts that these statements were materially false and misleading, because they failed to disclose that AOS's financial results

and projected future results "depended, in material part, on illegal sales to Huawei in violation

of" federal regulations, which made the company "vulnerable to regulatory scrutiny and liability

and related consequences arising from investigations." *Id*. ¶ 57. Plaintiff further asserts that

AOS's statements that it achieved its success despite a challenging geopolitical environment and

trade tensions misleadingly implied "that the Company's financial success had been

accomplished notwithstanding those limitations" and by operating "within the legal limits of the

U.S. export control regime." *Id*. ¶ 58.

Second, on August 23, 2019, AOS filed its annual Form 10-K disclosure to the Securities

and Exchange Commission. The form stated that AOS's international operations "may subject" it

to risks from "economic and political instability, including trade tension between the U.S. and

China," as well as "trade restrictions, changes in laws and regulations relating to, amongst other

things, import and export tariffs." *Id*. ¶ 59. The 2019 10-K further stated that the business might

face difficulties from "changes as a result of regulatory restrictions applicable to China-exported

products." *Id*. ¶ 60. Plaintiff asserts that these statements were materially false and misleading

because they failed to disclose that certain risks described as hypothetical had already

materialized, and in particular that the discussion of risk factors "warned only of the potential

consequences of changes in the applicable law concerning sales to China without disclosing that

the Company's practices already violated applicable existing law and regulations." *Id*. ¶ 61.

Third, on November 4, 2019, AOS announced its financial results for the first quarter of

FY2020, reporting revenue of $117.8 million and projecting revenue for the second quarter of

between $117 million and $120 million. In an investor call that day, Mike Chang stated, "Despite

macro headwinds and growing market uncertainty, we are generating positive results by

executing our prudent business strategy." *Id*. ¶ 63. Also on the call, Stephen Chang stated that the

company had met its expectations even in the face of trade tensions impacting the 5G telecom business. *Id*. ¶ 64 ("We saw some softness in the 5G telecom business during the September quarter in the midst of trade tensions."). Plaintiff again asserts that these statements were misleading because they did not disclose that "the Company's export control practices were in violation of applicable laws," that past and future success depended on "illegal sales" to Huawei rendering AOS vulnerable to regulatory scrutiny and liability. *Id*. ¶ 65. Plaintiff also asserts that the statement that AOS's results were obtained despite softness in the telecom sector amidst trade tensions misleadingly implied that AOS had achieved its success in compliance with export regulations, and was not dependent on "illegally evading" them. *Id*. ¶ 66.

Finally, on November 12, 2019, AOS filed its quarterly 10-Q report for the first quarter of 2020, which stated that the risk factors previously reported to the SEC had not changed. *Id*. ¶ 67. Plaintiff asserts this statement was misleading for the same reasons that the discussion of risk factors in the August 2019 Form 10-K were misleading. *Id*. ¶ 68.

## II.    Procedural Background

Plaintiff brought suit on March 19, 2020, asserting claims under Section 10(b) of the Securities Exchange Act (and Rule 10b-5 promulgated thereunder) and Section 20(a) of the Securities Exchange Act. *See* Dkt. 1. On July 1, 2020, the Court granted Mr. Gray's motion for appointment as lead plaintiff and for approval of lead counsel, and set a schedule for the filing of an amended complaint and for briefing on the instant motion. Dkt. 14. The operative Amended Complaint was filed on August 28, 2020. Dkt. 17. Defendants moved to dismiss the operative complaint on October 27, 2020. *See* Dkt. 23 (notice of motion); Dkt. 24 (memorandum of law). Plaintiff opposed the motion, Dkt. 26, and also filed a motion to strike Exhibits 5 through 11 of the Declaration of Anna Pia D. Felix (which consist largely of news articles), submitted by

Defendants in connection with their motion to dismiss. *See* Dkts. 28; 29.[3] Defendants filed a

reply memorandum in support of their motion to dismiss on January 25, 2021. *See* Dkt. 33.

## LEGAL STANDARDS

### I.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting

*Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the

plaintiff] will ultimately prevail," but "whether [the] complaint [is] sufficient to cross the federal

court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted). In

answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no

effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)). Moreover, on a motion to

dismiss, a court "may consider any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference, legally required public disclosure

documents filed with the SEC, and documents possessed by or known to the plaintiff and upon

---

[3] Because the Court has not relied on the challenged materials in ruling on this motion, the motion
to strike is denied as moot. *See Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL
4747666, at *3, n.3 (S.D.N.Y. Sept. 30, 2019) (denying as moot motion to strike an affidavit where
the court did not rely on the challenged affidavit).

which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.     Motions to Dismiss Under Federal Rule of Civil Procedure 9(b) and the PSLRA

In addition to the requisite Rule 12(b)(6) pleading standards, the Amended Complaint is also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting" the alleged fraud.  Fed. R. Civ. P. 9(b).  To do so successfully, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

The PSLRA expands on Rule 9(b) and requires "that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (internal quotation marks omitted).  Nevertheless, "even with the heightened pleading standards of Rule 9(b) and the PSLRA, the Court '[does] not require the pleading of detailed evidentiary matter[s] in securities litigation.'"  *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011)).

## DISCUSSION

To properly plead a violation of Section 10(b) and Rule 10b–5, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns Inc.*, 493 F.3d at 105). Here, Defendants challenge the sufficiency of the allegations only with respect to the first (material misrepresentation or omission), second (scienter), and fifth (loss causation) elements. The Court discusses each in turn.

## I.      Material Misrepresentations or Omissions

Under Rule 10b-5, it is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). To support a finding of liability under Rule 10b-5, there must be "an actual *statement* [] [made] that is either untrue outright or misleading by virtue of what it omits to state," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (internal quotation marks omitted), or a "'pure omission' . . . 'when the corporation is subject to a duty to disclose the omitted facts.'" *Id.* (citations omitted). As such, the "starting point for any 10b-5 case is the existence of material misstatements or omissions of fact." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010).

Whereas a pure omission is actionable when the defendant has a statutory or regulatory duty to disclose the omitted information, a "half-truth" is actionable where the corporation has made a statement but omits information rendering the statement "inaccurate, incomplete, or misleading." *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992). This rule against half-

truths "comports with the common-law tort of fraudulent misrepresentation," whereby "'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *In re Vivendi*, 838 F.3d at 240 (quoting Restatement (Second) of Torts, § 529, cmt. *a* (1977)).

A misleading statement or omission is material if "there [is] a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction." *In re Lululemon*, 14 F. Supp. 3d at 572; *see also Basic v. Levinson,* 485 U.S. 224, 231-32 (1988) (a material fact is one that would be "viewed by the reasonable investor as having significantly altered the total mix of information made available."). However, "whether a reasonable investor would find a particular misrepresentation or omission 'material' to an investment decision is usually a matter reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) (citation omitted); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (rejecting statistical significance as a requisite for pleading materiality and noting that materiality is "fact-specific."). For that reason, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

As noted above, Plaintiff argues that Defendants misleadingly failed to disclose that they were continuing to make illegal sales to Huawei after the addition of Huawei and its affiliates to the Entity List, and that their statements concerning AOS's positive performance in the face of a difficult geopolitical environment misleadingly implied that AOS had achieved its success by contending with, rather than flouting, the regulatory landscape and geopolitical environment.

Plaintiff argues that even if Defendants did not have a duty to disclose uncharged misconduct or the risk of future investigations or litigation, AOS's statements about its strong financial performance "put[] the topic of the cause of its financial success at issue," *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005), such that it was required to disclose that its success depended on illegal or at the very least questionably legal exports to Huawei.

Defendants make several arguments in favor of dismissal. First, they argue that any misleading statements or omissions bearing on AOS's relationship with Huawei were not material, because Huawei accounted for a relatively small share of AOS's total revenues. Second, they argue that Plaintiff has failed to allege in anything more than a conclusory manner that AOS was engaged in illegal exports to Huawei, such that any statements implying that AOS was properly contending with a difficult geopolitical environment and trade tensions are not plausibly alleged to be false or misleading. Third, Defendants argue that even if Plaintiff had adequately alleged that AOS engaged in illegal exports, AOS "[did] not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citation omitted), and that its statements about the geopolitical environment and trade tensions were too generic to trigger such a disclosure obligation. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (internal quotation marks and citation omitted) ("The critical consideration for . . . courts in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions are sufficiently connected to defendants' existing disclosures to make those public statements misleading.").

As an initial matter, the Court is not persuaded by Defendants' materiality arguments. Defendants rely on the fact that sales to Huawei accounted for only 2 to 4.2 percent of AOS's

overall business, *see* Am. Compl., ¶¶ 45-46, such that those revenues do not meet the five percent threshold that the SEC and some courts have recognized as a useful guidepost for assessing materiality. *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 422–23 (S.D.N.Y. 2013) ("Where misstatements implicate less than 5% of an entity's revenue, the misstatements are not likely to be material."). But the Second Circuit has made clear that materiality is an "inherently fact-specific" inquiry, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011), that should not be analyzed using a "formulaic approach." *Ganino*, 228 F.3d at 162. Although the five percent threshold "may provide the basis for a preliminary assumption of materiality, . . . a bright line percentage cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Hutchison*, 647 F.3d at 485 (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (1999)). As noted above, at the motion to dismiss stage, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (cleaned up). Here, if Plaintiff were able to establish in a subsequent amended complaint that Defendants misleadingly failed to disclose continued sales to Huawei, the Court might not conclude that such a failure would be "so obviously unimportant" to investors to render it nonactionable, for several reasons. First, Huawei is alleged to be a "strategic customer[]" of AOS, such that its business could arguably be shown to be qualitatively important to AOS investors even if it accounted for a numerically small share of overall business. Am. Compl. ¶ 45. Second, if AOS was engaging in illegal behavior that was likely to bring about regulatory penalties, reasonable investors might consider that significant information, even if the behavior related to a customer whose business represented less than five

percent of overall revenues. Finally, investors would not necessarily consider it unimportant if AOS, which earned approximately 97 percent of its total revenue from shipments to Hong Kong and China, *see id*. ¶ 26, was struggling to keep up with the new regulatory landscape involving U.S.-China trade. Immateriality therefore does not provide a basis for dismissal of the action at this stage of the litigation.

The Court agrees with Defendants, however, that Plaintiff has failed to sufficiently allege that AOS violated the export control regulations. "Because the gravamen of the amended complaint is that [AOS's allegedly unlawful sales to Huawei] rendered the challenged statements false or misleading," *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 631–32 (S.D.N.Y. 2017), the failure to sufficiently allege that AOS made illegal exports is fatal to the complaint. As the Second Circuit recently reemphasized, "When a securities fraud claim is premised on the defendant's predicate violations of law or accounting standards, the facts of that underlying violation must be pled *with particularity*." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, --- F.4th ---, 2021 WL 3744894, at *4 (2d Cir. Aug. 25, 2021) (emphasis added). *See also Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) ("[W]hen a complaint claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA."); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred."); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (dismissing Section 10(b) claims based on nondisclosure of an alleged illegal scheme, where the "plaintiffs offer[ed] nothing more than

conclusory allegations that [such a] scheme existed"). "The issue at this stage, of course, is not whether Plaintiff has proved that Defendants actually violated the law, but rather whether Plaintiff has stated a claim that they did so." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 803 (S.D.N.Y. 2018).

The Amended Complaint asserts in a number of places that, following the addition of Huawei to the Entity List, AOS made illegal sales to Huawei. *See, e.g.,* Am Compl. ¶ 46 (AOS's sales to Huawei were "in violation of" the export restrictions); *id*. ¶ 47 (Defendants failed to disclose that AOS revenues "were derived from illegal sales to Huawei"); *id*. ¶ 48 (Defendants' statements were misleading to the extent they implied that AOS's "financial success was not dependent on illegally evading . . . export controls"); *id*. ¶ 51 (shipments to Huawei "had been illegal since May 15, 2019"). The assertion that such sales were necessarily illegal depends on the assumption that adding Huawei to the Entity List amounted to an uncompromising "ban," Am. Compl. ¶ 40, such that any and all exports to Huawei—even indirect ones—were unlawful. Defendants strenuously dispute this characterization of the regulations, arguing that "the rules are much more complex, consisting of over forty chapters of regulations with myriad exemptions that allow continued sales to an entity that has been placed on the Entity List, even in cases where a license is not formally issued." Def. Mem. at 7 (citing 15 C.F.R. §§ 730-774). To give one example, although "[a] license is required . . . to export . . . any item subject to the EAR" to a listed entity, *see* Supplement No. 4 to 15 C.F.R. § 744, some goods are not "subject to the EAR," such as certain items with a *de minimis* amount of U.S. content, *see* 15 C.F.R. § 734.4; Def. Mem. at 8.

Although the complaint points to media commentary describing the addition of Huawei to the list as a "ban," *see id*. ¶ 36, Plaintiff appears to concede that that the description is not

quite accurate, seeing as the regulation contains exemptions. As Plaintiff stated in his opposition memorandum,

> Companies seeking to lawfully export goods to an Entity List party are required to obtain a specific license issued by the BIS, *unless a particular exemption applies*. Accordingly, those seeking to do business with a listed party are expected, as standard practice, *to thoroughly analyze export regulations to assess whether and to what extent they may lawfully continue to sell products to a listed party*, and the BIS instructs companies seeking to export goods they believe are subject to an exemption to "perform careful due diligence to ensure the item is not going to an embargoed or sanctioned country, a prohibited end-user, or used in a prohibited end-use."

Pl. Mem. at 8 (emphasis added). The complaint also cites a statement from the President of the Semiconductor Industry Association that "[e]ach [semiconductor] company is impacted differently [by the addition of Huawei to the Entity List] based on their specific products and supply chains, and each company must evaluate how best to conduct its business and remain in compliance." Am. Compl. ¶ 37. The statement noted that "it is now clear some items may be supplied to Huawei consistent with the Entity List and applicable regulations." *Id*. Taken together, these allegations suggest that the mere fact that AOS continued to export goods to distributors who in turn sold to Huawei does not necessarily mean that AOS violated the law.

Against this backdrop, Plaintiff's claim that AOS's indirect sales to Huawei were illegal must be rejected as conclusory. *See Danske Bank*, --- F.4th ---, 2021 WL 3744894, at *4. Apart from the bald assertions that AOS engaged in illegal conduct, the complaint contains no analysis of the applicable regulations and why AOS's indirect sales to Huawei violated them. Plaintiff laments that "Defendants note there are numerous exemptions to the EAR but do not identify any exemptions that are applicable to AOS's shipments to Huawei, nor have Defendants disclosed which products they sold to Huawei." Pl. Mem. at 17. This is true, but it does not meaningfully help Plaintiff, whose burden it is to "adequately plead that the misconduct did, in fact, occur." *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *5 (S.D.N.Y. Mar. 28,

2018). *See also In re Axis Capital*, 456 F. Supp. 2d at 585 ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original).

One allegation in the complaint that arguably bears on whether AOS was engaged in wrongdoing is that it eventually came under investigation by the Department of Justice and that the government requested that it suspend shipments to Huawei. *See* Am. Compl. ¶ 54. Plaintiff argues that this development "strongly supports an inference of culpability." Pl. Mem. at 17. The Court is reluctant, however, to infer wrongdoing on AOS's part from the mere existence of an investigation. For one thing, "government investigations are just that, investigations." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015); *see also In re XP Inc. Sec. Litig.*, --- F. Supp. 3d ---, 2021 WL 861917, at *9 (E.D.N.Y. Mar. 8, 2021) (to establish underlying misconduct, plaintiffs may not "rely solely on the *accusation* and *investigation* of [mis]conduct") (emphasis in original). Here, the fact that the government is probing AOS's conduct for wrongdoing cannot be enough to establish that wrongdoing has been or will be found. *See Menaldi*, 164 F.Supp. 3d at 582 (holding plaintiffs failed to plausibly allege that the corporate defendant had violated the FCPA or U.S. sanctions, notwithstanding that the SEC and DOJ were investigating it). "To hold otherwise would be to subject corporations to a preemptive duty to 'confess' as soon as a regulatory agency begins an investigation." *Id*. (citing *City of Pontiac*, 752 F.3d at 184; *see also In re XP*, 2021 WL 861917, at *9 ("[A] government investigation, without more, does not trigger a generalized duty to disclose.") (citation omitted). For these reasons, the Court finds that Plaintiff has not adequately alleged that AOS's indirect sales to Huawei were illegal, and therefore that none of its statements describing its positive performance or its efforts to contend with a difficult geopolitical climate and trade tensions are

plausibly seen as "inaccurate, incomplete, or misleading." *Glazer*, 964 F.2d at 157.[4] The absence

of materially false or misleading statements or omissions thus furnishes one basis for dismissal

of the complaint.

## II.    Scienter

The Court next considers Defendants' arguments that, even if Plaintiff has shown that

Defendants made materially misleading statements or omissions, they have not sufficiently

alleged that Defendants did so with the requisite scienter. The Court agrees.

"Scienter is the mental state embracing an intent to deceive, manipulate, or defraud by the

maker of a statement." *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 319, 323 (2007)). The "scienter requirement is met where

the complaint alleges facts showing" either (1) a "motive and opportunity to commit the fraud,"

or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  *Emps.' Ret.*

*Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation

---

[4] Even if AOS's sales to Huawei could be shown to have been unlawful, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct." *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). Defendants would have had a duty to disclose such allegedly illegal sales only if "the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." *In re Sanofi*, 155 F. Supp. 3d at 403. For example, "where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices," *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (citing *In re Van der Moolen*, 405 F. Supp. 2d at 388), so long as there is "a connection between the illegal conduct and the misleading statements." *Menaldi*, 164 F. Supp. 3d at 581. Because the Court finds that Plaintiffs have not sufficiently alleged that AOS engaged in illegal misconduct, it need not consider whether Defendants' statements during the Class Period were sufficiently connected to AOS's allegedly improper or illegal business practices. *See In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006) (nondisclosure of misconduct is actionable only where (1) "illegal conduct was specifically pled" and (2) "there was a direct nexus [between the illegal conduct and] the defendant's existing disclosures which rendered those statements misleading").

omitted); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). To adequately plead that the statements were made or that information was omitted with the requisite scienter, a plaintiff must plead facts that, "taken together[,] give rise to a strong inference that the makers of the statements . . . knew that their statements were false or misleading when made, or recklessly disregarded that possibility." *In re Lululemon*, 14 F. Supp. 3d at 581 (citing *Tellabs* 551 U.S. at 323-24 and *Novak*, 216 F. 3d at 308-09). The question is thus "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original).

At the motion to dismiss stage, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24. "In other words, it is not enough to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks and citation omitted). Rather, the scienter requirement is met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Court must therefore ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 326). The PSLRA likewise requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A).

Here, Plaintiff does not seek to establish scienter through allegations that Defendants had

a motive and opportunity to commit fraud. Accordingly, Plaintiff's ability to plead this element depends on the strength of his "circumstantial evidence of defendants' conscious misbehavior or recklessness," which "must be correspondingly greater" in light of the absence of motive and opportunity allegations. *Kalnit*, 264 F.3d at 142 (internal quotation marks and citations omitted). "Conscious misbehavior" generally refers to "deliberate, illegal behavior." *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Novak*, 216 F.3d at 308). Recklessness, on the other hand, can be adequately pleaded where the allegations show that Defendants' conduct was "highly unreasonable" and constituted "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (emphasis in *S. Cherry St.*). In other words, the recklessness required to plead scienter is "conscious recklessness—i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *Id.* (quoting *Novak*, 216 F.3d at 312) (emphasis in *S. Cherry St.*). Circumstantial evidence can support a strong inference of scienter, under the "conscious misbehavior or recklessness" theory, where defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (citation omitted).

Plaintiff argues that Defendants' culpable mental state can be inferred from the facts that the listing of Huawei was widely publicized, that Defendants had a duty to keep abreast of trade regulations, that the Individual Defendants had senior positions in the corporation and years of experience in the industry, and that the Department of Justice opted to investigate AOS. Plaintiff

notes that there was a tremendous amount of public information available about the addition of Huawei to the Entity List, Am. Compl. ¶¶ 71-73, such that "it is implausible that Defendants were unaware that Huawei and numerous affiliates had been placed on the Entity List in May 2019, thus barring their sales to Huawei," *id*. ¶ 74. Plaintiff asserts that Defendants had a duty to monitor trade restrictions and compliance risks, and recklessly disregarded the risks that their sales to Huawei would be found in violation of such rules. Pl. Mem. at 36-37.

The Court agrees with Defendants that the complaint fails to sufficiently plead facts supporting an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Court has no trouble accepting, for the sake of argument, that Defendants can be presumed to have known about the addition of Huawei to the Entity List, given the vast amount of news coverage it generated, the response within the semiconductor industry, their general obligation to monitor trade restrictions and compliance risks, and the Individual Defendants' positions as senior executives in a semiconductor firm that made a significant number of indirect sales to Huawei. But even if this is true, Plaintiff assumes that Defendants "knew, should have known, or had access to information that AOS's post-ban shipments to Huawei were illegal, or of highly questionable legality." Pl. Mem. at 34 (emphasis added). This is a leap too far. Knowing that Huawei was added to the Entity List does not mean knowing that all business with Huawei after that addition was unlawful. As discussed above, Plaintiff has not established that the mere fact that AOS continued to make indirect sales to Huawei after its addition to the Entity List necessarily means that AOS violated the law. *See* Pl. Mem. at 8 (a license is required to export to a party on the Entity List "unless a particular exemption applies"); *see also* Am. Compl. ¶ 37 (Semiconductor Industry Association statement) ("As we have discussed with the U.S. government, it is now

clear some items may be supplied to Huawei consistent with the Entity List and applicable regulations. Each company is impacted differently based on their specific products and supply chains, and each company must evaluate how best to conduct its business and remain in compliance."). Plaintiff has not identified any "reports or statements" available to Defendants that would have shown that its exports were unlawful and thus "would have demonstrated the falsity of the allegedly misleading statements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to" facts that would contradict their public statements, "they must specifically identify the reports or statements containing this information."). There is no allegation contradicting AOS's representations that it "has maintained an export control compliance program," Am. Compl. ¶49, or suggesting that its compliance program was lacking. The circumstantial evidence accordingly does not support an especially strong inference—or one "at least as strong as any opposing inference," *ECA*, 553 F.3d at 198—that Defendants (a) knew that AOS's indirect sales to Huawei were illegal and (b) consciously or recklessly sought to keep that fact from investors. Particularly in the absence of any well-pleaded allegations that the sales were in fact illegal, the Court sees no reason to find the inference that Defendants knowingly misled investors to be "at least as compelling" as the competing non-culpable inferences that Defendants either were acting in accordance with law or believed in good faith that they were. *See Tellabs*, 551 U.S. at 314.[5]

---

[5] Even if sales to Huawei could be said to be part of the "core operations" of AOS's business, that would be "insufficient by itself to support strong circumstantial evidence of scienter"; rather, the core operations doctrine only "bolsters the strength of the inference of scienter when plaintiff has *already* adequately alleged facts indicating that defendants might have known their statements were false." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011)).

Finally, the existence of the DOJ investigation does not establish that Defendants knew they were doing something illegal and consciously or recklessly misled investors about it. To begin with, there is no allegation that Defendants knew of the existence of the investigation at the time of the most recent challenged statement on November 12, 2019. Am. Compl. ¶ 67. Defendants disclosed the investigation on February 5, 2020, and asserted that it had been "recently commenced." *Id*. ¶ 8. More significantly, it is well established that the existence of a government investigation does not on its own establish a strong inference of scienter. Although government investigations into misconduct can provide some supplemental support to the strength of an inference of scienter, *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013), "government investigations cannot bolster allegations of scienter that do not exist." *Lipow*, 131 F. Supp. 3d at 167. In the absence of any allegations that charges have been brought or that DOJ has identified any wrongdoing on AOS's part, "as currently plead, the government investigations are just that, investigations." *Id*. The Court accordingly finds that the Amended Complaint has failed to plead facts giving rise to a strong inference that Defendants consciously or recklessly misled investors about their sales to Huawei.

## III.    Loss Causation

In addition to seeking dismissal on the two elements discussed at length in this opinion, Defendants also argue that Plaintiff has failed to plead loss causation—that is, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted). To survive a motion to dismiss, "a plaintiff need only allege either: '(i) facts sufficient to support an inference that it was a defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss,' or (ii) 'facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud].'" *Richman v. Goldman Sachs Grp., Inc.*, 868 F.

Supp. 2d 261, 282 (S.D.N.Y. 2012) (citations omitted and alteration in original) (quoting *Lentell*, 396 F.3d at 177, and *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)). The Court need not resolve the sufficiency of the loss causation allegations, as it has identified two other deficiencies in the Amended Complaint, each of which independently justifies dismissal. The Court notes, however, that "[a] decline in stock price following a public announcement of 'bad news' does not, by itself, demonstrate loss causation." *Richman*, 868 F. Supp. 2d at 282. Assuming Plaintiff has a good faith basis to file an amended complaint, Plaintiff is advised to draw the Court's attention to specific false or misleading statements that caused AOS's securities to trade at inflated prices, or maintained inflated prices, and to allege that the corrective disclosure was causally linked to the price inflation "coming out" of the price of the security. If, in fact, the DOJ investigation itself amounts to the materialization of a concealed risk, Plaintiff "must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk." *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 760 (S.D.N.Y. 2018) (quoting *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011)).

## IV.    Section 20(a) Claim

Finally, under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a claim under Section 20(a), a plaintiff must show (1) "a primary violation by the controlled person," (2) "control of the primary violator by the defendant," and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. Control person liability under Section 20(a) requires an underlying primary violation of Section 10(b) of the Securities Exchange Act. *See id.* Because Plaintiff has failed to adequately plead a

violation of Section 10(b), his claim for Section 20(a) control person liability by the Individual

Defendants also fails. *See In re Lululemon*, 14 F. Supp. 3d at 587.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss the Amended Complaint

is granted. The Court will, however, permit Plaintiff an opportunity to submit a second amended

complaint to cure the deficiencies identified in this opinion, to the extent he has a good faith

basis to do so. Plaintiff's amended complaint, if any, shall be filed no later than October 27,

2021. If he chooses to amend his complaint, Plaintiff shall also submit a redline demonstrating

the changes between the operative complaint and the new complaint. Failure to file an amended

complaint by October 27, 2021 will result in dismissal of this action with prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 23

and 28.

SO ORDERED.

Dated:     September 27, 2021
           New York, New York

_____

Ronnie Abrams
United States District Judge